22 Ill. App.3d 999 (1974)
317 N.E.2d 585
CHARLESTON NATIONAL BANK, Adm'r of the Estate of Rex L. Brandenburg, Plaintiff-Appellant,
v.
INTERNATIONAL HARVESTER COMPANY, Defendant-Appellee.
No. 12110.
Illinois Appellate Court  Fourth District.
September 5, 1974.
Rehearing denied November 4, 1974.
*1000 John E. Norton, of Belleville, and Henry E. Kramer, of Brainard, Bower & Kramer, of Charleston (Edward J. Kionka, of counsel), for appellant.
Jack E. Horsley, Richard F. Record, Jr., and Stephen L. Corn, of Craig & Craig, of Mattoon (Paul C. Nelson, of Law Department, International Harvester Co., of Chicago, of counsel), for appellee.
Reversed and remanded.
Mr. JUSTICE TRAPP delivered the opinion of the court:
Plaintiff, as administrator, sued for wrongful death. The trial court directed a verdict for defendant upon a count alleging product or manufacturer's liability. This appeal follows a finding as provided in Supreme Court Rule 304.
Plaintiff's decedent fell from the operating station of a large earth-moving vehicle known as a payscraper. The evidence is that the vehicle weighed approximately 13 tons, and that the driver's station was about 8 feet above ground level. The driving platform was substantially the width of a single seat. The allegations specified that the machine was *1001 unreasonably dangerous in that the driver's seat latching device was inadequate and unsuited for its intended purpose of holding the driver's seat in a stable position; that the operator's station was not properly and safely designed to prevent the operator from falling from the machine, and that the machine was not equipped with adequate instructions and warnings that the driver should not stand up while operating the machine. It is alleged that such defects were the proximate cause of death when decedent was thrown or fell from the machine on to the ground and was run over by it.
 1 A directed verdict requires that the trial court find that the evidence, in its aspects most favorable to the plaintiff, so overwhelmingly favors defendant that no contrary verdict could ever stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill.2d 494, 229 N.E.2d 504.
On the morning of October 30, 1968, decedent was operating the payscraper to move dirt from the east to the west end of the job. After emptying a load he would return eastward along a recently completed concrete highway to the starting point for another cycle of moving dirt from a nearby ditch. The evidence conflicts as to whether several windows of dirt, some 9 inches high, had been placed across the highway to slow traffic and that such were located southwest of where decedent was found.
At about 11 A.M., decedent was found face down on the pavement with his head crushed. The machine continued under its own power some 150 feet until it had veered into a bank of earth and halted with the engine running. There was blood on the inside of the right rear wheel. Decedent's head was the only portion of his body that was injured. The body was found in the right hand lane of the paved road with the head approximately 3 feet from the edge of the pavement and at an angle to the southwest. The coroner testified to his conclusion that decedent's head was squeezed between the inside of the tire and the body of the machine.
Decedent had operated the machine throughout the morning until his death at about 11 A.M. At times he had been observed operating the machine while standing. There is testimony that standing is a dangerous practice and that defendant had been warned about it by his employer. There is also testimony concerning the practice of the operators of such machines to stand while driving because of perspiration and for respite from the jolting.
Decedent was observed some 30 to 35 seconds before his death, seated and driving the machine eastward along the highway at some 8 to 10 miles per hour. There is testimony that empty machines travelling upon a highway might bounce a great deal.
*1002 All the evidence on the issue of unreasonably dangerous condition concerns the driver's compartment on the payscraper. The suspension system of the driver's seat was designed for a farm tractor and patented by defendant's engineers. The component parts of the seat are manufactured by the Bostrom Company, but sold by defendant without change as official International Harvester parts to and through defendant's dealers. The seat was designed to enable an operator of farm equipment to adjust the height of the seat rearward or frontward relative to a steering wheel or a farm tractor. The seat is adjustable to five positions, encompassing a total movement of 5 inches front to back and 3 inches upward from the lowest and most forward position to the highest and most rearward position. Such adjustability is not necessary on the payscraper. The seat was secured in one of the five positions by means of two latches, or in engineering terms, pawls. The lower pawl, when locked in position, prevented the seat from moving to the rearward positions. The seat was spring mounted, so that if the lower pawl was disengaged or broken, the seat would spring back from the position to which it had been adjusted to the most rearward position. Thus, if the lower pawl was disengaged or broken, while the seat was in its forwardmost position, the seat would spring back 5 inches and up 3 inches; if the seat were already adjusted to its rearwardmost position, a broken pawl would result in no change of position of the seat. The driver's weight, however, is sufficient to depress the springs, so that if the lower latch or pawl were broken, the seat would not come up if the driver was sitting quietly in the vehicle at rest. It was customary to adjust the seat to be in the lowest position unless one was extremely tall, in which case the seat might be adjusted to the second lowest position. The seat was also designed to tilt forward.
There is expert testimony to the effect that the seat was defectively designed, both because of the dual cam seat latching arrangement and because the light spring clip intended to prevent the seat from tilting forward was inadequate for its purpose since a sudden movement from breakage of either cam would throw the seat back and allow it to tilt forward.
Mechanical tests show that the metal in the pawl was porous and without sufficient tensile strength to sustain its potential load. However, if the vehicle were moving on a very smooth pavement, with constant speed, and the driver sitting quietly, there are few possibilities that the spring clip itself, rather than the pawl, could come loose. If one were sitting on the machine, and the pawl broke, the seat would raise and go to the rear whenever the driver stood up, and if the driver then attempted to sit back down in a normal position, the seat would be too far to rear for operation. Pieces of the broken lower pawl of the seat on decedent's *1003 payscraper were found on the floor of the payscraper while it was still running shortly after decedent's death. When a co-worker sat on the seat of the payscraper in an attempt to drive it, the seat sank down about four inches. When the machine was then operated, the seat "bounced a little bit but that is all." The break in the latch was the sort that could be caused by a sudden impact not incident to movement down a smooth roadway with no shocks or fractures involved. The broken latch was one manufactured for defendant, and installed on the decedent's machinery 13 days prior to the incident to replace a previously broken lower seat latch. The broken latch found at the time of the incident had not been changed in any way since defendant's service mechanic installed it on decedent's payscraper on October 17, 1968. The seat on the other payscraper on the project had been wired down; the seat on decedent's payscraper was not wired down.
On delivery, the machine in question was not equipped with safety belts, guard rails, or any other lateral protection device to prevent the operator from falling off the machine other than the arms of the seat itself. There is expert testimony to the effect that the operator's area was not properly designed because there was nothing to prevent the operator from falling. This was described as the major hazard to the operator.
Also, there is expert testimony to the effect that the danger of operating the machine in a standing position should be pointed out to the operators in a printed operator's guide, and that decals in the operator's area should warn the operator of the use of various safety devices, and should also warn the operator that an operator's guide with safety rules is available. There were no such warnings on the payscraper in question.
The court's reasons for directing a verdict are obtained from colloquy in the record. He concluded that there was no evidence from which the jury could reasonably infer that decedent fell from the machine, or from which they could infer that a safety device might have prevented a fall. Such conclusion was founded upon a preceding conclusion that the position in which the body was found was inconsistent with falling in such a manner that the machine passed over it. He concluded that decedent could have climbed from the machine despite the fact that it was moving at some speed, that decedent was seen seated some 30 seconds before and that the machine continued under its own power over some distance.
On this record, we cannot say that no verdict other than one for defendant could ever stand, and under Pedrick, we reverse. It appears highly unlikely upon the facts of this case that decedent voluntarily left his operator's position on the payscraper. There is sufficient evidence in the record from which the jury could conclude that decedent fell or *1004 was thrown off the moving machine, whether or not as a result of the broken seat latch. There is testimony that the vehicle in question could bounce markedly while driving down the highway in question. There were hand prints on the air cleaner immediately to the right and in front of the driver's compartment, and the machine had driven some 150 feet down the highway without a driver. A motion picture admitted into evidence and shown to the jury rather clearly demonstrates that if the scraper portion is in the raised position, it would be possible for the operator of a moving scraper to fall from his position, cling momentarily to the air cleaner, and have the entire machine pass over his body without injuring any portion of the operator other than his head, leaving the body in the position relative to the payscraper testified to at trial. There is sufficient evidence from which the jury could conclude that the lower seat latch broke while plaintiff was seated, and that when plaintiff stood up the seat sprang backwards resulting in decedent's loss of balance when he attempted to sit down again. The record reveals sufficient evidence to go to the jury that decedent's death resulted from an unreasonably dangerous condition of the payscraper which existed at the time it left defendant's control and was the proximate cause of decedent's death. Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182.
In Hardware State Bank v. Cotner, 7 Ill. App.3d 212, 287 N.E.2d 13 (reversed on other grounds), this court discussed Olsen v. Pigott, 39 Ill. App.2d 191, 188 N.E.2d 361, and Clubb v. Main, 65 Ill. App.2d 461, 213 N.E.2d 63. In each case there was no eye witness to the occurrence events. This court said:
"In Clubb and Olsen, the evidence was undisputed that their deaths were caused by the particular machinery. The evidence was undisputed that each piece of machinery was defective in one or more ways. In addition, in Olsen, evidence was presented that previous epileptic seizures had been experienced by the plaintiff and this was assigned as a possibility for his fall from the equipment. Evidence negating this was presented. Likewise in Clubb it was argued that the plaintiffs fall from the tractor was occasioned by physical illness or that a wasp or bee may have attacked him. These cases merely demonstrate that there are proper cases for jury determination where the facts are disputed, where reasonable inferences from known facts are divergent or where the conduct of the plaintiff is not free from doubt." 7 Ill. App.3d 215, 216.
The questions of whether decedent was operating the machine while standing and eating a sandwich, and if so, such conduct constituted "misuse" of the product sufficient to defeat liability are matters to be *1005 raised by affirmative defense and to be decided by the jury. Williams v. Brown Manufacturing Co., 45 Ill.2d 418, 261 N.E.2d 305.
Defendant's argument that there is no evidence that the machine was in the same condition as when it left the defendant manufacturer does not persuade. An invoice in evidence shows that the machine was delivered to the decedent's employer about September 9, 1968. There is no dispute that it was delivered without seat belts, side rails or other protective devices. The evidence is clear that the broken pawl described in evidence was a replacement made by defendant at a time for service on October 17, 1968. So far as the allegations in issue are concerned, the evidence shows that it was in the same condition as at the time delivered.
As this case must be remanded for a new trial, we consider various errors in evidentiary rulings that should not occur on retrial. The trial court excluded testimony by two witnesses of prior breakages of the power seat latches. The basis of these rulings was absence of sufficient foundation to show similarity of circumstances in the previous breakages. Although there was no evidence as to the circumstances under which the other machines were operated, the payscraper is obviously designed for heavy duty off-the-road use, and would never be operating on a paved highway except to transport loads of dirt or the tractor itself from place to place. The other witness testified that the latches on the identical machines used on the project where decedent was killed had suffered broken latches which had to be replaced.
 2, 3 The evidence of other instances of breakage in cases of this type are admissible to show that the common cause is a dangerous or unsafe condition and that the manner in which the pawl served its purpose is material to the safety of the machine for its practical use. It is also material to show notice of such unsafe condition to the manufacturer. (City of Bloomington v. Legg, 151 Ill. 9, 37 N.E. 696; Moore v. Jewel Tea Co., 116 Ill. App.2d 109, 253 N.E.2d 636, aff'd, 46 Ill.2d 288, 263 N.E.2d 103.) In Vlahovich v. Betts Machine Co., 101 Ill. App.2d 123, 242 N.E.2d 17, aff'd, 45 Ill.2d 506, 260 N.E.2d 230, and Ray v. Cock Robin, Inc., 10 Ill. App.3d 276, 293 N.E.2d 483, it was held to be error to exclude evidence of such similar occurrences. There is other testimony in the record that defendant received 10 to 40 complaints per year concerning the broken pawls over a period of years. Although the excluded testimony might have been cumulative, on remand such testimony should not be excluded as inadmissible.
 4, 5 A copy of a report prepared by one of the defendant's engineers was denied admission into evidence on the basis that as the author of the report was present in court to testify, the report should not be admitted *1006 into evidence because the author's testimony and not the report would be the best evidence of the matters contained in the report. The report included instructions to remove the lower seat latch and to weld a portion of the seat to the frame to eliminate the need for the lower latch, because, unlike a farm tractor, a payscraper does not have any specific need for a seat to be adjustable to enable the operator to stand up. There was no explanation of the absence of the original. Upon such a foundation, the trial court correctly ruled that the copy should not be admitted under the "best evidence" rule. However, the "best evidence" rule is merely a preference for documentary originals, and such rule does not require the exclusion of documentary evidence where oral testimony to the same effect is available. On remand, if the original is produced or its absence satisfactorily explained with proper authentication of a copy, the report should not be excluded by virtue of the "best evidence" rule, and should be accepted into evidence if no other evidentiary objections are properly sustainable. Cleary, Handbook of Illinois Evidence § 15.1 at 245-246 (2d ed. 1963); Pugh v. Bershad, 133 Ill. App.2d 174, 272 N.E.2d 745.
 6 Certain data sheets published by the National Safety Council were testified to be authoritative and were excluded from evidence on the basis that they were not competent. It appears that portions of these data sheets are not relevant and were properly excluded. However, the relevant portions should have been accepted into evidence to aid the jury in deciding what was feasible, and what the defendant knew, or should have known, about safety precautions without conclusively determining the standard of care to be imposed upon defendant. Hardware State Bank v. Cotner, 55 Ill.2d 240, 302 N.E.2d 257.
The judgment is reversed and the cause remanded for further proceedings not inconsistent herewith.
Reversed and remanded.
SMITH, P.J., and SIMKINS, J., concur.